IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SIGNODE, a division of ILLINOIS TOOL WORKS INC., | ) ) ) ) |
| Plaintiff, | ) Case No. 09 C 7860 ) |
| v. | ) Judge Virginia M. Kendall ) |
| SIGMA TECHNOLOGIES INT'L, LLC, | ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Signode, a division of Illinois Tool Works Inc. ("Signode"), filed suit against Defendant Sigma Technologies International, LLC ("Sigma Tech"), alleging breach of contract, breach of express and implied warranties, negligent misrepresentation, negligent design, and rescission arising from the sale of an allegedly defective and non-conforming Plasma Machine. Sigma Tech moves to dismiss the case pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue, respectively. Alternatively, Sigma Tech moves for a transfer of venue to the District of Arizona pursuant to 28 U.S.C. § 1404(a). For the reasons discussed below, Sigma Tech's Motion to Dismiss or to Transfer is denied.

**BACKGROUND**

Signode manufactures steel straps and is a Delaware corporation with its principal place of business located in Glenview, Illinois. (R. 1, Compl. ¶ 1.) Sigma Tech manufactures large-scale industrial treatment systems and is a Delaware Limited Liability Company with its sole place of business in Tucson, Arizona. (*Id*. ¶ 2.) Part of the process of manufacturing steel straps requires

the straps to be cleaned so paint can adhere to them. (*Id.* ¶ 7.) Signode contacted Sigma Tech seeking to replace its phosphate system for cleaning straps with electron beam technology. (R. 12, Decl. of Leonard E. Johnson ¶ 3.) On August 2, 2007, two Signode representatives traveled to Arizona and met with representatives of Sigma Tech. (Compl. ¶ 8; Decl. of Leonard E. Johnson ¶ 5.) At this meeting, the parties discussed Sigma Tech's capabilities to design and manufacture a system to clean Signode's steel straps and ultimately agreed that Sigma Tech would put together a proposal for the design and manufacture of a plasma machine that could clean the straps. (Compl. ¶ 9; Decl. of Leonard E. Johnson ¶ 7.)

On August 9, 2007, Signode sent samples of steel straps from its plant in Bridgeview, Illinois (the "Bridgeview plant") to Arizona so Sigma Tech could determine whether it had the technology needed to clean the straps. (Decl. of Leonard E. Johnson ¶ 6.) Later that year, Sigma Tech sent the proposal to Signode in Illinois. (Compl. ¶ 10; Decl. of Leonard E. Johnson ¶ 7.) The proposal set forth Sigma Tech's offer to design and manufacture a plasma machine for use in Signode's Bridgeview plant. (*Id.*) In February 2008, Signode sent another set of sample steel straps and paint to Sigma Tech in Arizona so Sigma Tech could test whether its plasma unit could clean Signode's steel straps. (Compl. ¶ 11.) After cleaning the straps in Arizona, Sigma Tech returned the steel straps to Signode in Illinois. (*Id.*) Signode then sent samples of the oil solution on the steel straps from the Bridgeview plant to Sigma Tech in Arizona. (*Id.* ¶ 12.)

On March 4, 2008, after a number of communications between the parties, Signode sent Sigma Tech a purchase order for a plasma machine. (Compl. ¶ 13; Decl. of Leonard E. Johnson ¶ 8.) Under the terms of the agreement, Sigma Tech agreed to design the plasma machine to fit in the Bridgeview plant, to supply drawings of the machine to Signode in Illinois, and to supply an

engineer to supervise the installation and training at the Bridgeview plant. (Decl. of Leonard E. Johnson ¶ 9.) Signode, in turn, agreed to provide electrical service, supply drawings of the space available at the Bridgeview plant, provide labor to install the plasma machine, and make connections for exhaust and interconnecting duct work. (*Id*. ¶ 10.) Signode sent an amended purchase order three months later that added a stand-alone control console. (Compl. ¶ 14.) Signode agreed to pay Sigma Tech $427,000 for the plasma machine and $2,000 for the console. (*Id*.) Signode paid 30% of the purchase price at the time it issued the purchase order. (*Id*. Exh. C, Purchase Order.) Pursuant to the contract, Signode was to pay the remaining 60% at the time of shipping and 10% "upon installation or 30 days after delivery." (*Id*.) The agreement included a one-year warranty on the equipment and specified that Arizona law applied to the agreement. (*Id*. Exh. C, Quotation and Specification.)

In early April 2008, two of Sigma Tech's representatives spent three days at the Bridgeview plant. (Decl. of Leonard E. Johnson ¶ 12.) The representatives learned about the chemical cleaning system in place at the time, the paint application and curing process, and how the plasma machine would fit in Signode's existing system. (*Id*.) The representatives also provided Signode with a more complete understanding of electrode design and plasma generation. (*Id*.) After visiting the Bridgeview plant, Sigma Tech told Signode that it would supply two plasma units, instead of one, and Sigma Tech advised Signode of additional undertakings by Sigma Tech and modifications Sigma Tech would make to the plasma machine. (*Id*. ¶¶ 13-14.)

Signode accepted delivery of the completed plasma machine "freight on board" ("FOB") in Tucson, Arizona. (Compl., Exh. B, Purchase Order.) Later in January, as set forth in the agreement, three of Sigma Tech's representatives traveled to the Bridgeview plant to oversee the installation

of the plasma machine. (Decl. of Leonard E. Johnson ¶ 16.) From the beginning, Signode alleges, the plasma machine did not work according to specifications. (Compl. ¶ 16; Decl. of Leonard E. Johnson ¶ 16.) The same three representatives traveled back to the Bridgeview plant and spent nine days attempting to find a solution to what Signode claims is a flaw in the machine. (*Id.*) Again in May 2009, two of Sigma Tech's representatives spent two days at the Bridgeview plant trying to fix the machine. (*Id.*) In August of that year, Signode removed the plasma machine from the Bridgeview plant, and moved it to another location in Bridgeview, Illinois. (Compl. ¶ 22; Decl. of Leonard E. Johnson ¶ 17.)

On December 18, 2009, Signode brought this case for breach of contract, breach of express and implied warranties, negligent misrepresentation, negligent design, and rescission. (Compl. ¶3.) That same day, Sigma Tech filed suit against Signode in Arizona state court, alleging breach of contract and unjust enrichment, and seeking the remaining 10% owed on the contract. (R. 9, Mem. in Supp. of Mot. to Dismiss, Exh. 1.) Sigma Tech moved to dismiss this case, arguing that this Court lacks personal jurisdiction over Sigma Tech and that venue is improper. Alternatively, Sigma Tech argues that this case should be transferred to the District of Arizona.

## **DISCUSSION**

I.  **Motion to Dismiss Based on Lack of Personal Jurisdiction and Improper Venue**

    A.  **Personal Jurisdiction**

Signode bears the burden of showing that this Court has personal jurisdiction over Sigma Tech. *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). Signode need only make a *prima facie* showing of jurisdiction. *See Michael J. Neuman & Assocs., Ltd. v. Florabelle Flowers, Inc.*, 15 F.3d 721, 724-25 (7th Cir. 1994). When ruling on a motion to dismiss for lack of

personal jurisdiction and improper venue, the Court may rely on evidence outside the pleadings, such as the affidavits and declarations that have been presented here. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (addressing personal jurisdiction); *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007) (addressing improper venue). The Court will resolve all factual disputes in Signode's favor. *See Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983).

A federal court sitting in diversity jurisdiction has personal jurisdiction only if a court in the state in which it sits would have jurisdiction. *See RAR*, 107 F.3d at 1275. The Illinois long-arm statute, applicable here, contains a "catch-all" provision that "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 714-15 (7th Cir. 2002) (citing 735 ILCS 5/2-209(c)). There is no "operative difference" between the limits imposed by the Illinois Constitution and the federal limits on personal jurisdiction. *Hyatt*, 302 F.3d at 715 (citing *RAR,* 107 F.3d at 1276). Accordingly, the personal jurisdiction analysis collapses into a federal due process inquiry. *See RAR*, 107 F.3d at 1276; *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 945 (7th Cir. 1992) (stating that the inquiry into whether a state statute grants personal jurisdiction over a Sigma Tech is "wholly unnecessary in the case of many modern state statutes which include catch-all provisions").

This Court may exercise personal jurisdiction over a non-resident defendant by demonstrating that the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *RAR, Inc.*, 107 F.3d at 1277. What that means in a particular case depends on whether the state asserts

"general" or "specific" jurisdiction. *See id*. Here, Signode concedes that this Court does not have general jurisdiction over Sigma Tech. (R. 12, Resp. to Mot. to Dismiss at 9).

In determining whether specific jurisdiction exists, the Court examines whether it is "fundamentally fair" to require the defendant to submit to jurisdiction with "respect to this litigation." *Purdue*, 338 F.3d at 780 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). The notions of fair play and substantial justice are not offended if the defendant "purposefully avail[ed] itself of the privilege of conducting activities" in Illinois. *RAR*, 107 F.3d at 1277 (quoting *Burger King Corp. V. Rudzewicz*, 471 U.S. 462, 474-75 (1985)). This inquiry focuses on foreseeability, that is, whether the defendant could have anticipated being brought to court in Illinois in the matter at issue. *See Purdue*, 338 F.3d at 780. In making this determination, the Court examines whether the defendant deliberately engaged in significant activities or created continuing obligations within the forum state. *See id*. at 780-81.

An out-of-state party's contract with an Illinois resident is alone not sufficient to establish the requisite minimum contacts. *See RAR*, 107 F.3d at 1277. Instead, the Court must look to several other factors, including who initiated the transaction, where the negotiations were conducted, where the parties executed the contract, and where the defendant would have performed the contract. *See id*. In a breach of contract case, "only the 'dealings *between the parties in regard to the disputed contract*'" are relevant to the minimum contacts analysis. *Id*. at 1278 (emphasis in original).

Here, Sigma Tech could have anticipated being sued for breach of contract in Illinois. While it is true that Signode initiated contact with Sigma Tech, and Sigma Tech does not have any other customers in Illinois, other factors establish the requisite minimum contacts. Although the parties initially met and discussed Sigma Tech's technology in Arizona, after the parties met in Arizona,

6

they continued to communicate by email and telephone about the plasma machine proposal for the Bridgeview plant. Signode sent samples of steel straps from its Bridgeview plant to Arizona for testing, and Sigma Tech sent the proposal to Signode in Illinois. The communications between the parties, therefore, occurred in both locations and do not weigh heavily on either side. In a case like this one, "where the parties engaged in substantial communications between and within the two states involved, the locations of the parties when the words "I accept" were uttered are entitled to little weight." *Viktron Ltd. P'ship v. Program Data Inc.*, 759 N.E. 2d 186, 194 (Ill. App. 2d 2001).

On the other hand, the contract contemplated that a substantial part of Sigma Tech's performance was to take place in Illinois, rendering Sigma Tech subject to the jurisdiction of Illinois courts. Even though the plasma machine was manufactured and delivered in Arizona, the contract also provided that Sigma Tech would send an engineer to oversee installation of the machine and service it in Illinois during its one-year term warranty period. Indeed, Sigma Tech sent engineers to the Bridgeview plant as promised on three occasions—once to oversee installation and training and two other times for repairs. Sigma Tech's representatives also visited the Bridgeview plant prior to the sale of the plasma machine. Because Sigma Tech entered into a contract that required part performance in Illinois, it cannot claim that a breach of contract lawsuit in Illinois was not foreseeable. *See E.A. Cox Co. v. Road Savers Intern. Corp.*, 648 N.E. 2d 271, 276 (Ill. App. Ct. 1995) (stating that a defendant who enters "into a contract that require[s] part performance in Illinois and then subsequently enter[s] this state to perform acts in furtherance of that contract" is subject to personal jurisdiction in Illinois courts).

7

**B.     Venue**

Because Sigma Tech is subject to personal jurisdiction in Illinois, its motion to dismiss based on improper venue is also denied. In a diversity action, venue is proper in any district where a single defendant resides if all defendants reside in one state. *See* 28 U.S.C. § 1391(a). For purposes of venue, Sigma Tech resides in Illinois. *See id.* (stating that, for purposes of venue, "a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction); *see Denver & R.G.W.R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 562 (1967) (treating a "multi-state, unincorporated association . . . like the analogous corporate entity" for purposes of venue); *see, e.g.*, *Advocate Fin., L.L.C. v. Parker Interests, L.L.C.*, No. 07-757-FJP-CN, 2008 WL 2773650 at *1 (M.D. La. July 16, 2008) (Polozola, J.) (pointing out that "it is generally accepted that unincorporated business associations such as partnerships and limited liability companies are analogous to corporations for venue purposes"); *Nayani v. Horseshoe Entm't*, No. 3:06-CV-01540-M , 2007 WL 1062561 at *8 (N.D. Tex. Apr. 10, 2007) (citing *Penrod Drillnig Co. v. Johnson*, 414 F.2d 1217, 1220-21 (5th Cir. 1969), and treating a partnership as a corporate defendant for purposes of venue); *Pippett v. Waterford Dev., LLC*, 166 F. Supp. 2d 233, 238 (E.D. Pa. 2001) (treating a LLC as a corporate defendant for purposes of section 1391(c)). The Northern District of Illinois is a proper venue.

**II.    Motion to Transfer**

As an alternative to its Motion to Dismiss, Sigma Tech asserts that this case should be transferred to the District of Arizona pursuant to 28 U.S.C. § 1404(a). Section 1404(a) states: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. §

1404. Signode does not dispute that the District Arizona qualifies as a district where this action may have been brought. Therefore, the question before the Court is whether transferring this case would increase the convenience of the parties and witnesses and advance the interests of justice. *See Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986). Sigma Tech bears the burden of establishing that the District of Arizona is clearly more convenient. *See id*. It has not done so here.

### A. Convenience of the Parties and Witnesses

When evaluating the convenience of the parties and witnesses, courts weigh the following factors: the plaintiff's choice of forum, the location of the material events, the relative ease of access to sources of proof, the convenience of the witnesses, and the convenience to the parties of litigating in the respective forums. *See, e.g.*, *Nalco Co. V. Environ. Mgmt., Inc.*, No. 08 C 2708, 2010 WL 890216 at *2 (N.D. Ill. Mar. 8, 2010) (Hibbler, J.) (discussing these five factors); *Allied Van Lines v. Aaron Transfer & Storage, Inc.*, 200 F. Supp. 2d 941, 946 (N.D. Ill. 2002) (same); *Hanley v. Omarc, Inc.*, 6 F. Supp. 2d 770, 774-76 (N.D. Ill. 1998) (same); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (noting the factors "pertaining to the private interests of the litigants"). Regardless, a court's decision to transfer "must promote the efficient administration of justice, rather than simply shift the inconvenience from one party to the other." *Lyons v. Ill. Cent. R.R. Co.*, No. 09 C 3444 , 2009 WL 5125218 at *1 (N.D. Ill. Dec. 18, 2009) (Gettleman, J.); *see also, e.g.*, *Black v. Mitsubishi Motors Credit of Am., Inc.*, No. 94 C 3055, 1994 WL 424112 at *1 (N.D. Ill. Aug. 10, 1994) (Conlon, J.) (stating that "venue may not be transferred simply to shift inconvenience from the defendant to the plaintiff").

Unless the balance weighs strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. *See Piper Aircraft Co.*, 454 U.S. at 242; *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 664 (7th Cir. 2003). This is particularly true where, as here, the plaintiff's choice of forum is also its home forum. *See, e.g.*, *Lyons*, 2009 WL 5125218 at *1; *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1167 (N.D. Ill. 1995). If, however, "'the conduct and events giving rise to the cause of action did not take place in Plaintiff's selected forum, the plaintiff's preference has minimal value.'" Lyons, 2009 WL 5125218 at *1 (citation omitted); *see also, e.g.*, *Dunn v. Soo Line R. Co.*, 864 F. Supp. 64, 65 (N.D. Ill. 1994).

Neither party will be particularly burdened by the location of witnesses because both agree that there are likely no third-party witnesses. (R. 12, Resp. to Mot. to Dismiss at 14.) Nevertheless, the other "private" interests here weigh in favor of Signode. Signode chose to bring this case in the Northern District of Illinois, its home forum. As discussed above, many of the events giving rise to the cause of action took place in this district. Under the contract, Sigma Tech was obligated to design and manufacture a plasma machine specifically for use in the Bridgeview plant. Important pieces of proof— the plasma machine and the steel straps—are currently located in this District. Because the machine is allegedly not working properly, a site review or expert analysis of the equipment seems possible. Unlike the heavy equipment relevant to this case that is located in this District, any documents located in Arizona can easily be shipped or otherwise transported here. Transfer is not appropriate if it simply "'transforms an inconvenience for one party into an inconvenience for the other party.'" *Vandeveld*, 877 F. Supp. at 1167 (quoting *Sage Prods., Inc. v. Devon Indus., Inc.*, 148 F.R.D. 213, 216 (N.D. Ill. 1993)).

**B.    The Interests of Justice**

The "public" interests also weigh in Signode's favor. The interests of justice component of § 1404(a) focuses on the efficient and fair administration of the courts rather than on the interests of the litigants themselves. *Coffey*, 796 F.2d at 220. In making this determination, the Court considers the relative speed with which the case will go to trial, the familiarity of the judge with the applicable law, and the desirability of resolving controversies in a particular locale. *See, e.g.*, *Piper Aircraft Co.*, 454 U.S. at 241 n.6 (listing the public factors); *Merix Pharm. Corp. v. EMS Acquisition Corp.*, No. 09 C 5871, 2010 WL 481247, at *5 (N.D. Ill. Feb. 4, 2010) (Coar, J.) (same).

First, the likelihood of a speedy trial factor weighs slightly in favor of Signode. Two statistics are relevant when analyzing the likelihood of a speedy trial: (1) the median number of months from filing to disposition, and (2) the median number of months from filing to trial. *See, e.g.*, *Tingstol v. Co. v. Rainbow Sales, Inc.*, 18 F. Supp. 2d 930, 934 (N.D. Ill. 1998) (citing the Administrative Office of the United States Courts, Federal Court Management Statistics); *Vandeveld*, 877 F. Supp. at 1169 (same). According to the 2009 Federal Court Management Statistics, the median number of months from filing to disposition of a civil case in the Northern District of Illinois is 6.2 months, whereas the District of Arizona disposes of civil actions in a median 8.1 months. U.S. District Court—Judicial Caseload Profile, http://www.uscourts.gov/cgi-bin/cmsd2009.pl (last visited Mar. 22, 2010).[1] The median number of months between filing a civil action and going to trial in the Northern District of Illinois is 27.8 months, whereas the filing-to-trial time for a civil action in the District of Arizona is 29 months. *Id*. Two months is not a significant difference, but nevertheless weighs in Signode's favor.

---

[1]The Court will take judicial notice of the Administrative Office of the United States Courts's statistics. Sigma Tech did not provide the Court with any statistics, and Signode's statistics are from 2008.

11

This Court can competently apply Arizona contract law and both Illinois and Arizona have an interest in enforcing this contract. Sigma Tech points out that there is pending litigation in Arizona state court that arises from the same contract, involves the same parties, proof, and witnesses. While "related litigation should be transferred to a forum where consolidation is feasible," *Coffey*, 796 F.2d at 221, the related Arizona case is currently pending in state court, not the District of Arizona. Sigma Tech has not met its burden of proving that the interests of the parties and witnesses or the interests of justice weigh clearly in favor of transfer. Sigma Tech's Motion to Transfer is denied.

## CONCLUSION AND ORDER

For the reasons stated, Sigma Tech's Motion to Dismiss or to Transfer is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 24, 2010